UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

GORDON HORNER and ANN MARIE
HUDSON, individually and on behalf of
all others similarly situated,

                Plaintiffs,

      -v-                                        5:22-CV-1324 (AJB/TWD)

LITTLE CAESAR ENTERPRISES, INC., *et al.*,

                Defendants.

---

**Hon. Anthony J. Brindisi, U.S. District Judge:**

## DECISION & ORDER

       Plaintiffs Gordon Horner and Ann Marie Hudson, former employees of Little Caesars pizza restaurants, bring this action against defendants, a collection of business entities involved in franchise agreements with the pizza chain.[1] Plaintiffs allege defendants violated the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") through a common policy and practice of not paying them and other similarly situated employees for all hours

---

[1] Defendant Little Caesar Enterprises, Inc. is the national franchisor of the pizza restaurants that operate under the name "Little Caesars." Parties stipulated to, and the Court dismissed, defendant Little Caesar Enterprises, Inc. on January 25, 2024. *See* Dkt. Nos. 94, 95. The remaining named defendants—Phoenix Nexus Limited Liability Company ("Phoenix Nexus"), Main St LC LLC ("Main Franchise"), Manlius St SY LC LLC ("Manlius Franchise"), Onondaga Blvd SY LC LLC ("Onondaga Franchise"), Salina St SY LC LLC ("Salina Franchise"), Wolf St SY LC LLC ("Wolf Franchise"), Bartell Rd SY LC LLC ("Bartell Franchise"), Second St SY LC LLC ("Second Franchise"), State Rt SY LC LLC ("State Franchise"), North St SY LC LLC ("North Franchise"), Seventh St SY LC LLC ("Seventh Franchise"), Central Ave SY LC LLC ("Central Franchise"), Oswego Rd SY LC LLC and ("Oswego Franchise") (collectively, "Phoenix Nexus defendants")—are either themselves parties to franchise agreements with the national franchisor or acted as guarantor to those agreements.

1

worked or paying overtime worked. The matter, which was initially assigned to Senior U.S. District Judge Thomas J. McAvoy, has recently been reassigned to this Court. Dkt. No. 133.

Before the Court is plaintiffs' motion for an order (1) conditionally certifying the FLSA claims as a collective action pursuant to 29 U.S.C. § 216(b); (2) approving plaintiffs' proposed form and manner of notice to potential opt-in plaintiffs; and (3) equitably tolling the statute of limitations for those potential opt-ins. For the reasons below, plaintiffs' motion is **GRANTED** in part and **DENIED** in part.

I.   BACKGROUND

Plaintiffs have moved to conditionally certify a "collective action" pursuant to Section 216(b) of the FLSA. They submit a proposed Notice of Lawsuit Pendency and Consent to Join Form ("Consent Form") for the Court's approval. *See* Dkt. Nos. 84-10, 84-11. In support of their motion for conditional certification, plaintiffs provide declarations, pay stubs, employee handbooks, and hearing transcripts.

Named plaintiff Gordon Horner ("Gordon")[2] worked for Little Caesars between November 2018 and July 2022. Starting in September 2019, Gordon worked at locations owned or operated by the Phoenix Nexus defendants. Horner's Aff., Dkt. No. 84-4 at ¶ 2. He began as an assistant manager at the Manlius Street franchise. *Id*. After four or five months, Gordon was transferred to the Wolf Street franchise, where he became a store manager. *Id*. In total, Gordon worked at five Phoenix Nexus locations: Main Street, Manlius, South Salina, West Onondaga, and Wolf Street. *Id*. His transfers, he says, were all made at defendants' direction. *Id*.

Managers, Gordon asserts, were expected to be hands-on, performing the same tasks as hourly employees. *Id.* ¶ 14. Gordon dedicated "nearly all of [his] time" performing those

---

[2] Plaintiffs submitted affidavits and documents from Gordon Horner, Malaisha Hines, and Christina Hines in support of their pending Motion. For clarity and consistency, the Court refers to these plaintiffs by their first names.

duties—cashiering; taking, preparing, and boxing orders; and keeping the restaurant clean, among others. *Id*. Gordon found these expectations and tasks consistent at each of the locations he worked. *Id*. Despite his title, Gordon spent little time on "managerial" tasks. *Id*. ¶ 15. Every week, about two hours went to "inputting crew member schedules," based on labor hours set by his superiors. *Id*. He spent twenty minutes a week placing truck orders: a task requiring little more than a button click, as the shipment contents were pre-set "by corporate." *Id*. On the rare occasion he needed to make a change, it took about ten minutes. *Id*. Payroll approval took him about the same amount of time. *Id*. Though "approval" may be a misnomer, since Gordon had little latitude. *Id*. He could not adjust anything or change pay rates. *Id*. Given his workload, these managerial tasks often had to be done off the clock, usually from home. *Id*. About once a month, Gordon interviewed a job applicant. *Id*. It seldom took more than ten minutes, asking a few basic questions and checking boxes on a list. *Id*. If the applicant met the provided list's criteria, Gordon sent their materials up the chain for approval and onboarding. *Id*.

Gordon's shifts were usually ten hours a day, five days a week: a total of fifty hours a week. Horner's Aff. ¶ 4. Often, he worked up to seventy hours. *Id*. The restaurants closed at 9:30 p.m., yet Gordon often had to stay later, sometimes as late as 1:00 a.m. *Id*. ¶ 5. Even so, he was required to clock out by 11:00 p.m. *Id*. If not, he risked reprimand. *Id*. Whenever another worker called out, Gordon had to cover. *Id*. ¶ 6. That happened between one and fifteen times a month. ¶ 6. Despite the extra hours, Gordon made no overtime pay at all. *Id*. ¶ 7. He earned, purportedly, a "flat salary." *Id*. Notwithstanding being "salaried," he had to clock in and out like an hourly employee. *Id*. When Gordon worked fewer than fifty hours, defendants paid him for the number of hours he actually worked: calculating his "hourly rate" by dividing his "salary" by fifty. *Id*. ¶ 9. However, when he worked more than fifty hours, neither his pay stubs nor his

paycheck reflected it—fifty, sixty, or seventy hours, it made no difference; Gordon was paid the "flat salary" rate. *Id*. ¶ 13.

Gordon provides corroborating pay records. *See* Dkt. No. 84-8. These records suggest a pattern of diminished pay for the weeks where he worked less than fifty hours. *See, e.g.*, *id.* at 3 (providing the following over a seven-week period in August and September 2021—42.29 hours, $809.85 earned; 50 hours, $957.50 earned; 50 hours, $957.50 earned; 43.05 hours, $824.41 earned; 44.95 hours, $860.79 earned; 50 hours, $957.50 earned; 46.40 hours, $888.56 earned).

Gordon eventually learned that his experience was not unique to him. From 2019 to 2021, defendants held group meetings for the different location managers at a Little Caesars in North Syracuse. Horner's Aff., Dkt. No. 84-4 at ¶ 17. From conversations at those meetings, Gordon discovered that at least six of the other location "managers" there were paid as he was (*i.e.*, hourly) and also spent most of their time doing the same work as hourly employees. *Id*. Eventually, in 2022, defendants switched to paying him and the other managers exclusively on an hourly basis (including overtime). *Id*. ¶ 16.

Malaisha Hines ("Malaisha") and Christina Hines ("Christina") offer comparable accounts. *See* Dkt. Nos. 84-5, 84-6. Both started at Phoenix Nexus defendant franchises in 2019 and left in Summer 2023. M. Hines' Aff., Dkt. No. 84-5 at ¶ 2; C. Hines' Aff., Dkt. No. 84-6 at ¶ 2. Malaisha worked at several of the same franchises as Gordon did: Main Street, Manlius, Onondaga, and Salinas. Christina worked at Main Street and Manlius (like Gordon and Malaisha), in addition to the Brewerton and Oswego franchises (the latter of which was also worked at by Malaisha). *See* Horner's Aff. at ¶¶ 2–3; M. Hines' Aff., 1 at ¶ 2, 13–15; C. Hines' Aff. at ¶ 2.

Malaisha's typical workweek ranged from fifty-five to seventy-two hours, Christina's averaged between forty and sixty hours a week. M. Hines' Aff. at ¶ 5; C. Hines' Aff. at ¶ 4. Like Gordon, Malaisha and Christina dedicated "nearly all of [their] time performing the same duties as the hourly employees" and "spent very little time" on managerial tasks. M. Hines' Aff. at ¶¶ 11, 12; C. Hines' Aff. at ¶ 11; *see also* C. Hines' Aff. at ¶ 12 (estimating she spent "three hours per week…making schedules, checking inventory, placing truck orders, and conducting short interviews"). The Hines were paid by defendants just as Gordon was—an hourly rate below fifty hours a week; a "flat salary" above. M. Hines' Aff. at ¶¶ 6–8; C. Hines' Aff. at ¶¶ 5–7. They too attach corroborating pay stubs. *See, e.g.*, M. Hines' Aff. at 15 (listing 39.60 hours worked that pay period and corresponding pay of $742.50); *id.* at 14 (50.00 hours and $937.50); *id.* at 13 (46.79 hours and $877.31); C. Hines' Aff. at 6 (50.00 hours and $937.00); *id.* at 7 (45.31 hours and $725.96); *id.* at 8 (44.99 hours and $719.84).

Plaintiffs also include testimony given by an Area Supervisor for the Phoenix Nexus defendants at a hearing in October 2022 held before the New York Unemployment Insurance Appeal Board. *See* Dkt. No. 84-9. There, the Area Supervisor (themselves a location manager the year prior) explained: "[B]efore this year, [t]he minimum that you had to do to get the full payment for salary was 50 hours. If people did not do [so], what they would do is divide the 50 hours…and pay as many hours as [was] worked." Dkt. No. 84-9, at 3; *see* Dkt. No. 84-9, at 4 (reiterating defendants' payment practices when questioned) ("Q: So, I can work and give you 70 hours and you're going to pay me one flat fee, but if I work two hours shy, you're going to cut my pay? A: Yes."); *see also* Dkt. No. 84-9, at 5 ("Q: And is this told to you when you are hired? A: Yes, when [they] take over the position, an area supervisor…tell[s] them how much they will

be making[.]"); Dkt. No. 84-9, at 4 (remarking that "[j]ust from my experience[,] this is how they've always done it.").

Lastly, plaintiffs submit several of the Phoenix Nexus defendants' employee handbooks. Dkt. No. 84-7. These handbooks appear to be nearly identical—notably so in their descriptions of exempt and non-exempt employees, franchise pay practices, and overtime rules. *See* "Bartell Rd Employee Handbook," Dkt. No. 84-7, at 1–31; "Central Ave Employee Handbook," *id.* at 32–62; "Main St. Employee Handbook," *id.* at 63–93; "Manlius St. Employee Handbook," *id.* at 94–124; "North St. Employee Handbook," *id.* at 125–155; "Onondaga Blvd. Employee Handbook," *id.* at 156–186; "Oswego Rd. Employee Handbook," *id.* at 187–217; "Salina St. Employee Handbook," *id.* at 218–248; "Seventh St. Employee Handbook," *id.* at 249–279.

Based on the above, plaintiffs contend that defendants "have had a willful policy and practice of misclassifying [plaintiffs] and similarly situated Managers as 'exempt' to avoid paying them for all hours worked or appropriate overtime compensation[.]" *See* Second Amended Complaint, Dkt. No. 67 at 19–20.

## II.    STANDARD OF REVIEW

"Congress enacted the [FLSA] to correct 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018) (quoting 29 U.S.C. § 202(a)). "To that end, the FLSA imposes substantive wage, hour, and overtime standards, including requirements for the payment of a minimum wage and for time-and-a-half overtime pay for hours worked in excess of 40 hours during a week." *Id.* (citing 29 U.S.C. §§ 206(a), 207(a)(1)).

Section 216(b) "provides a private right of action to recover unpaid overtime compensation 'against any employer…by any one or more employees for and on behalf of himself or themselves and other employees similarly situated.'" *Calderon v. King Umberto, Inc.*, 892 F. Supp. 2d 456, 459 (E.D.N.Y. 2012); *see Neff v. Flowers Foods, Inc.*, 2016 WL 11808327, at *1 (D. Vt. Nov. 7, 2016) (noting the provision authorizes collective enforcement of FLSA violations).

Unlike a Rule 23 class, members of an FLSA collective must affirmatively opt in. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any [collective] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) ("Under the FLSA[,] 'conditional certification' does not produce a class with an independent legal status, or join additional parties to the action[;] The sole consequence of conditional certification is the sending of court-approved written notice to employees[.]").

**III.    DISCUSSION**

Plaintiffs seek conditional certification of an FLSA collective that includes "all current and former managers employed by defendants in the state of New York *and classified as exempt* at any time from December 9, 2019, through the date of trial." Pls.' Reply, Dkt. No. 92 at 7 (emphasis in original).

The Second Circuit has endorsed a two-step method used by district courts when considering certifying a collective action and permitting notice. *See Son v. Hand Hosp.*, 2025 WL 524026, at *5 (S.D.N.Y. Feb. 18, 2025); *see also Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016) ("In *Myers*, we endorsed a two-step process for certifying FLSA collective actions") (citing *Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010)).

"At the first step—on a motion for conditional certification—the district court must determine whether there are any 'similarly situated' potential plaintiffs[.]" *Gui Zhen Zhu v. Matsu Corp*, 424 F. Supp. 3d 253, 263 (D. Conn. 2020); *Laskowski v. St. Camillus Nursing Home Co., Inc.*, 2024 WL 4132198, at *7 (N.D.N.Y. Sept. 10, 2024) (Hurd, J.).

To achieve conditional certification, plaintiffs must "make a modest factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Laskowski*, 2024 WL 4132198, at *7 (quoting *Myers*, 624 F.3d at 555 (2d Cir. 2010)). When an employer is alleged to have improperly labeled employees as exempt from overtime rules, a plaintiff "accomplish[es] this by making some showing that there are other employees who are similarly situated with respect to their job requirements and with regard to their pay provisions, on which the criteria for many FLSA exemptions are based, who are classified as exempt pursuant to a common policy or scheme." *Myers*, 624 F.3d at 542 (internal alterations omitted). While this 'modest factual showing' cannot be satisfied simply by 'unsupported assertions,' the Court is to apply a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist. *Id.*

If conditional certification is warranted, the Court, within its discretion, may also order notice to potential opt-in plaintiffs. *Id.* at 7 (citing *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638, 644 (S.D.N.Y. 2010); *see also Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 346–47 (W.D.N.Y. 2011) ("Because a collective action requires written consent from the opt-in plaintiffs, it lies within the discretion of a district court to begin its involvement early, at the point of the initial notice, to ensure that the drafting and distribution of the notice is timely, accurate and informative.").

8

"At the second stage, the Court will, on a fuller record, decide whether the collective action 'may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs.'" *Laskowski*, 2024 WL 4132198, at *2 (quoting *Myers*, 624 F.3d at 555); *see Mizzero v. Albany Med Health Sys.*, 2024 WL 4343584, at *3–4 (N.D.N.Y. Sept. 30, 2024) (Suddaby, J.). If the record reveals that they are not, "[a] defendant can then move to decertify" the collective. *Davella v. Ellis Hosp., Inc.*, 2024 WL 98352, at *1 (N.D.N.Y. Jan. 9, 2024) (D'Agostino, J.); *see Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 123 (S.D.N.Y. 2011) (citing *Myers*, 624 F.3d at 554–55).

### A. Commonality

Defendants contend that plaintiffs have not provided sufficient information to show a common policy or practice affecting other managers.[3] They argue that plaintiffs have offered merely "conclusory statements" that "without the provision of any factual information are simply too vague" and "cannot support that business operations were 'centralized' and in turn, that [plaintiffs] were subjected to any common unlawful policy or practice." Dkt. No. 88, at 12.

Particularly, defendants highlight a series of instances in which plaintiffs do not explicitly identify all three of the following elements—(i) the specific defendant franchise where they

---

[3] For instance, defendants argue that the capitalization of the letter 'M' in the word "manager" represents a substantive distinction:

> The term 'Manager'…identifies the one exempt [FLSA] position[.] Managers are also commonly referred to or known as 'Restaurant Manager(s)' or 'Store Manager(s)' or 'General Manager(s)'. A Manager is distinguishable from the term 'manager,' with a lowercase 'm'…as encompassing multiple positions, *including Manager(s)* and non-exempt positions such as co-managers, assistant managers, crew leaders, and crew members, which are classified as non-exempt and at all times were paid overtime compensation under FLSA.

Dkt. No. 88, at 5–6 n.3 (emphasis added).

Absent more, the Court finds no merit in the argument and warns the parties not to rely on typographical nuance that serves only to obscure the issues. Future filings should aim for clarity, accuracy, and substance—not clever formatting.

9

worked, (ii) the exact dates of their employment at that defendant franchise, and (iii) their classification as exempt managers during that time.  According to defendants, the absence of direct corroborating evidence of every element in each situation renders plaintiffs' showing inadequate.  *See* Dkt. No. 88, at 10–11.

Further, in response to plaintiffs' assertion that they and other members of the proposed collective worked across various Phoenix Nexus franchises as needed by defendants, defendants argue that no such common practice has been alleged, focusing instead on the specific wording used in plaintiffs' declarations.  *See, e.g.*, Dkt. No. 88, at 11 (challenging the assertion that the franchises "maintain a practice of moving employees *back and forth* amongst various locations") (emphasis in original); *id.* at 12 (criticizing plaintiffs for failing to enunciate what exactly "(a) a 'transfer' is, (b) how or if it is similar to being 'sent to work' [by defendants] at different locations, (c) whether 'transfers' or being 'sent to work' occurred during continued employment (or various points of hire), (d) which locations they were sent or transferred from and/or to, (e) which locations they worked during the Proposed Class Period, and/or (f) whether they were working in the capacity of a Manager at the time for each."  Dkt. No. 88, at 12.

Even in those instances where plaintiffs managed to meet all of defendants' stringent demands, defendants contend that plaintiffs have failed to present the same level of detail with respect to any other potential opt-in plaintiffs—either at the same franchise locations where plaintiffs worked or at different franchise locations operated by defendants where neither Gordon, Malaisha, nor Christina were personally employed.  Therefore, defendants insist, "[s]uch conclusory statements without the provision of any factual information are simply too vague and cannot support that business operations were 'centralized' and in turn, that [plaintiffs

10

and the proposed collective] were subjected to any common unlawful policy or practice." *Id.* at 12.

None of these objections is persuasive. At this preliminary stage, defendants attempt to impose a heightened evidentiary standard that is wholly unsupported by the applicable law. In fact, they fail to cite a single case in support of these arguments (*see* Dkt. No. 88, at 9–12). But that is not surprising, since these arguments lack merit.

Employees need not be "identical [to the named plaintiffs] in all respects" to be considered "similarly situated." *Santos v. Nuve Miguel Corp.*, 2021 WL 5316007, at *4 (S.D.N.Y. Nov. 16, 2021). "As the Second Circuit has made clear, the FLSA is a remedial statute, and the federal courts should give it a liberal construction." *Barone v. LAZ Parking Ltd., LLC*, 2019 WL 5328832, at *6 (D. Conn. Oct. 20, 2019) (quoting *Aros v. United Rentals, Inc.*, 269 F.R.D. 176, 182 (D. Conn. 2010)). "[T]he FLSA is…humanitarian in purpose and [it] must not be interpreted or applied in a narrow, grudging manner." *Mangahas v. Eight Oranges Inc.*, 754 F. Supp. 3d 468, 510 (S.D.N.Y. 2024). "We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others. Those are the rights that Congress has specially legislated to protect." *Tenn. Coal, Iron & R. Co. v. Muscoda Loc. No. 123*, 321 U.S. 590, 597 (1944).

Plaintiffs' allegations are sufficiently detailed to warrant conditional certification. They submit declarations from Gordon Horner, Malaisha Haines, and Christina Haines, suggesting that—irrespective of restaurant location or franchise—the three shared similar job duties (that included many of the same assignments as non-exempt employees), were subject to the same administrative policies, were classified as exempt employees, and were paid under the same "flat

11

salary" structure despite performing tasks typical of hourly employees. Each declaration also asserts knowledge of other managers for defendants who share their experiences.

In further support, plaintiffs submit pay stubs and records indicating that when any of the three worked less than fifty hours in a week, their "salary" was docked. These submissions also align with plaintiffs' claims that they were not paid overtime or compensated for hours worked over that amount. Additionally, testimony from an Area Supervisor (a supervisory position for the Phoenix Nexus defendants overseeing employees at plaintiffs' level) supports their claims. The supervisor states rather plainly that managers for defendants were required to work at least fifty hours to receive full "salary," that they did not earn overtime for hours worked beyond that threshold, and that (to the supervisor's knowledge) this had always been defendants' policy and practice.[4] Plaintiffs have introduced evidence that the Court may credit at this stage that indicates the scheme extended to all managers deemed exempt in New York.

In sum, plaintiffs have met their minimal burden to show that "there are other employees who are similarly situated with respect to their job requirements and with regard to their pay provisions, on which the criteria for many FLSA exemptions are based, who are classified as exempt pursuant to a common policy or scheme." *Myers*, 624 F.3d at 555 (internal citations and alterations omitted). Accordingly, the Court will conditionally certify the FLSA collective of all current and former managers employed by defendants in the state of New York and classified as exempt at any point within the period provided by the Court below.

---

[4] The foundation for the supervisor's knowledge of the ubiquity and longevity of the alleged practices by defendants reasonably may be questioned. Even so, their assertion that they, like plaintiffs, were a location manager the year prior suggests, at the very least, that they, too, had been subject to the alleged practices.

### B. Notice, Opt-In Period, and Equitable Tolling

Even assuming plaintiffs' showing warranted conditional certification, defendants argue that the time frame plaintiffs propose for identifying potential opt-in plaintiffs—a range that reaches "through the date of trial"—is overly broad and not supported by the facts presented. Accordingly, defendants urge the Court to deny the Motion for Conditional Certification in its entirety. Pls.' Reply, Dkt. No. 92, at 7  In the alternative, defendants contend that the collective action and notice should be limited to those who worked for defendants "through January 18, 2022[.]" *See* Defs.' Proposed Publication Order, Dkt. No. 88-1, ¶ 1.

This argument will be rejected. Although there is some indication that defendants stopped classifying managers as exempt at some point in 2022, the date this allegedly occurred is unclear. Mindful that "[i]n exercising its discretion at the conditional certification stage, [it] does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations," *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 402 (S.D.N.Y. 2012) (quoting *Cunningham*, 754 F. Supp. 2d at 644), the Court will approve plaintiffs' proposed end date at this stage.

Plaintiffs, for their part, request that they be permitted to send Notice to those individuals employed by defendants within three years prior to December 9, 2019, the date of the filing of the original Complaint. *See* Pls.' Reply, Dkt. No. 92, at 7; Dkt. No. 1. "Under the FLSA, plaintiffs are generally afforded two years to file a claim from the time the cause of action accrued unless the violation is 'willful,' in which case plaintiffs are afforded three years." *Cheng Xia Wang v. Shun Lee Palace Rest., Inc.*, 2018 WL 3155835, at *5 (S.D.N.Y. June 28, 2018) (citing 29 U.S.C. § 255(a)).

13


Where, as here, the parties dispute the willfulness of the violations, courts—without determining the merits of the claim(s)—typically apply a three-year, rather than a two-year, lookback window. *See Bethel v. BlueMercury, Inc.*, 2022 WL 3594575, at *13 (S.D.N.Y. Aug. 22, 2022); *see also Cohen v. Gerson Lehrman Grp., Inc.*, 686 F. Supp. 2d 317, 331 (S.D.N.Y. 2010) (collecting cases attesting "[c]ourts routinely approve a three-year notice period").

"Courts have reasoned that this approach will increase the likelihood that more party plaintiffs with timely claims consent to opt in, with the understanding that at the appropriate stage in the litigation, defendant will have an opportunity to argue that each plaintiff's claim is untimely because equitable tolling does not apply." *Bethel*, 2022 WL 3594575, at *13 (internal citations omitted). Consistent with these approaches, the Court will apply the FLSA's three-year lookback window at this stage of the case.

Plaintiffs' request for equitable tolling appears intertwined with, if not tantamount to, their request for a three-year lookback period. While related and presented now as one request, they are—given the particularities of the present litigation—properly considered as two distinct requests.

In the certification context, "courts have discretion to equitably toll the limitations period…to avoid inequitable circumstances." *McGlone v. Cont. Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012). "The delay caused by the time required for a court to rule on a motion, such as one for certification of a collective action in a FLSA case, may be deemed an 'extraordinary circumstance' justifying application of the equitable tolling doctrine." *Yahraes v. Rest. Assocs. Events Corp.*, 2011 WL 844963, at *2 (E.D.N.Y. Mar. 8, 2011) (collecting cases).

Plaintiffs' motion for conditional certification has been pending since December 18, 2023. *See* Dkt. No. 84. "While plaintiffs wishing to pursue their rights cannot sit on them indefinitely, those whose putative class representatives and their counsel are diligently and timely pursuing the claims should also not be penalized due to…understandable delays in rulings." *McGlone*, 867 F. Supp. 2d at 445. Accordingly, the Court will equitably toll the limitations period for the intervening time between December 18, 2023, and the date of this Opinion & Order.[5]

### IV. CONCLUSION

Therefore, it is

**ORDERED** that

1. Plaintiffs' motion (Dkt. No. 84) is **GRANTED IN PART and DENIED IN PART**;

2. The Court **CONDITIONALLY APPROVES** the following putative FLSA collective:

> All current and former managers employed by defendants in the state of New York and classified as exempt at any time from December 9, 2019 through the date of trial.

3. Plaintiffs are **ORDERED** to submit an amended Notice of Lawsuit, Consent to Join Form, and Proposed Publication Order that comply with the above decision for the Court's approval within fourteen (14) days.

The Clerk of the Court is directed to terminate the pending motions.

**IT IS SO ORDERED.**

Dated: May 15, 2025
   Utica, New York.

Anthony J. Brindisi
U.S. District Judge

---

[5] If there are additional grounds warranting further tolling for potential opt-in plaintiffs, plaintiffs may motion for such relief at the appropriate time.